UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DENNIS D'AMBRA, individually and     :
doing business as Flickers and     :
Club Balloons,     :
       Plaintiff,     :
    :
      v.     :     C.A. No. 11-600M
    :
CITY OF PROVIDENCE, by and through     :
its Treasurer, James J. Lombardi, III, et al.,   :
       Defendants.     :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Dennis D'Ambra was the owner and operator of two adult entertainment clubs on Allens Avenue in Providence, Rhode Island, until the clubs were shut down by the Providence Board of Licenses on August 13, 2010. He claims that this action of the Board deprived him of his constitutional rights of substantive due process and equal protection. He seeks to hold the City of Providence liable under 42 U.S.C. § 1983.

This matter is before the Court for report and recommendation on the Fed. R. Civ. P. 12(b)(6) Motion to Dismiss of Defendants City of Providence, through its Treasurer, James J. Lombardi, III, (collectively "Providence" or "the City") and the Providence Board of Licenses, together with its members acting in their official capacities, Andrew Annaldo, Arys Batista, Everett Bianco, Allene Maynard and Paul Ragosta (collectively "the Board of Licenses" or "the Board").[1] ECF No. 15. The Motion challenges the sufficiency of the allegations in Counts II

---

[1] These are the members of the Board of Licenses named in the Amended Complaint. Since it was filed, the membership of the Board has changed to some degree. Defendants moved pursuant to Fed. R. Civ. P. 25(d) to substitute as parties the current members of the Board, which was done by order on June 29, 2012. Because this suit alleges claims against the members solely in their official capacities, the substitution of new members does not affect that this is a claim against the municipality.

and IV that Providence itself may be liable under Section 1983 for the revocation of Plaintiff's licenses, which allowed him to operate "Flickers" and "Club Balloons" (collectively, "Balloons").  It also asks this Court to test whether these Counts clear the bar of the now familiar plausibility standard articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

Both of the challenged Counts – Counts II and IV – are recommended for dismissal. Municipal liability does not attach based on Plaintiff's allegations of antipathy because those claims do not challenge conduct attributable to Providence itself, as defined in Monell v. Department of Social Services, 436 U.S. 658 (1978).  Rather, without attribution to any final decision maker within Providence, Plaintiff alleges that unnamed "City officials" singled out Balloons for unfair treatment.  The only decision that could expose the City under Section 1983 – the revocation of Plaintiff's licenses by the Board of Licenses – does not plausibly infringe Plaintiff's rights to either substantive due process or equal protection as guaranteed by the Fourteenth Amendment.  Therefore, I recommend that Defendants' Motion to Dismiss be GRANTED and that Counts II and IV be dismissed.  Finally, because there appear to be threads of federal principles woven into the remaining claims (Counts I and III), I recommend that the Court retain jurisdiction for further proceedings.

I.      **Background Facts**

The Amended Complaint is focused on the August 13, 2010, decision of the Providence Board of Licenses revoking all licenses held by Balloons.  Am. Compl., ECF No. 3, at 1 (Introduction).  The Board's decision followed in the wake of a scuffling/fisticuffs incident that occurred as Balloons closed in the early morning of July 11, 2010.  Id. ¶ 20.  Twenty minutes after the Club closed, a patron of Balloons was shot and killed in an adjacent parking lot.  Id. ¶

2

21 & Ex. 1.  The Amended Complaint asserts that there was no link between the murder and events inside the Club, including how the Club responded to those events, and that, far from being unsafe, the Club used a variety of security measures to create a safe environment for patrons.  Id. ¶¶ 19-21.

The target of these claims, the Board of Licenses, is the creature of Section 1102 of the Home Rule Charter for the City of Providence ("Charter").  The Board's functions are subject to such "terms, limitations and conditions as prescribed by state law, this Charter or ordinance of the city council."  Providence, R.I., Charter § 1102(b).  Unique among the municipalities of Rhode Island, the Board is directly delegated by the Rhode Island General Assembly the power to "require a license for any place within its respective city . . . at which any performances, shows, exhibitions, . . . are presented or conducted . . . and may deny, revoke, or refuse to renew any such license only upon the ground that the place presents a danger to the public health or safety."  R.I. Gen. Laws § 5-22-5.  The Charter similarly grants the Board the broad discretion to cancel or revoke any license that it has issued "for any reason which the board may deem to be in the public interest."  Providence, R.I., Charter § 1102(b)(3).[2]

Under the Charter, the Board may "receive from the police department notification of the violation of the terms of any license and any information concerning a person holding any such license which relates to the fitness of such person to be licensed."  Id. §1102(b)(2).  Apart from an appeal in connection with a liquor license, which is not at issue here because Balloons was not licensed to serve liquor, an appeal from a decision of the Board is by certiorari petition to the

---

[2] The Charter lays out requirements for notice and hearing in advance of the Board's consideration whether to revoke a license.  Providence, R.I., Charter §§ 1102(b)(3), 1204.  The Board's website explains that it follows Robert's Rules of Order, as well as the "State Administrative Procedures Act for Violation Hearings and Rule of Evidence."  See Board of Licenses FAQ, http://www.providenceri.com/license/faqs (last visited Dec. 20, 2012).  Plaintiff does not allege that he was denied procedural due process or that these procedures were either flawed or not followed properly, although he does criticize the alleged failure of the Board to promulgate rules despite pressure from citizens and civic organizations to do so.  Am. Compl. ¶ 62.

Rhode Island Supreme Court.  See Thayer Amusement Corp. v. Moulton, 7 A.2d 682, 685 (R.I. 1939).  This remedy is discretionary and does not involve a *de novo* hearing.  D'Ambra v. City of Providence, 21 F. Supp. 2d 106, 108 (D.R.I. 1998).

In accordance with Section 1102(b)(2) of the Charter, the Providence police petitioned the Board to close Balloons and revoke all of its licenses as a result of the July 11 incident culminating in the murder.  Am. Compl. ¶ 24.  Within three days, the Board issued a show cause order and began hearings, which were convened on July 14 and July 21, 2010.  Id.  The hearings featured one or more recordings from video security cameras and extensive testimony from the police, the veracity of which Plaintiff disputed then and now.  Id. ¶¶ 26-38.  There was also argument by counsel regarding the evidence and the conduct of the management and security personnel of Balloons during the incident.  Id. ¶ 39.  The Board convened again on August 11, 2010, to deliberate and make its decision.  Id., Ex. 1.

On August 13, 2010, the Board issued its decision revoking all Balloons's licenses.  Id. The decision is based on eleven findings of fact, concluding that Balloons's management and security personnel were unable to control the patrons yet failed to notify the police about violence occurring in the Club; that the violence inside spilled outside culminating in the murder of a patron; that the management failed to act in a responsible manner creating unreasonable risk of harm to patrons and "safety of the public at large;" and that the management and security personnel responded to the melee with a machete and baseball bats, demonstrating "willful and wanton disregard for public safety."  Id.  The decision is entirely focused on circumstances that might pose a danger to public safely and the role of Balloons's management and security personnel in creating risk of danger to patrons and the public at large.  Id.

4

The Amended Complaint asserts that the police who testified at the hearing gave misleading testimony, characterized by exaggeration, contrivance, speculation, hearsay and inflammatory conclusions, all of which the Board accepted and relied upon.  Id. ¶¶ 27-38.  It also alleges that the Board was swayed by the argument of counsel to draw unreasonable inferences from the evidence.  Id. ¶ 39.  As a result, the Amended Complaint asserts, the Board's factual conclusions, especially those linking the murder to Balloons and those linking Balloons's management to a machete and baseball bats, are wrong.  Id.  In addition to these incorrect findings of fact, the Amended Complaint also claims that the sanction imposed by the Board – complete revocation of all licenses – was excessive and inappropriately harsh, by comparison with the sanctions imposed on other adult entertainment clubs in Providence for analogous incidents.  Id. ¶¶ 57-58.  The Amended Complaint lists seven other "similarly situated" adult clubs whose operations allegedly were linked to such dangers to public safety as fatalities, gunplay inside the Club, and a melee that required the police to use chemical spray to disperse the crowd.  Despite the seriousness of the incidents, the Board assessed less severe sanctions.  Id. ¶ 58.

Plaintiff appealed the Board's decision by writ to certiorari to the Rhode Island Supreme Court, the sole avenue for an appeal from a revocation of these licenses.  The Petition asked the Supreme Court to vacate the Board's factual findings and penalties.  On April 27, 2011, the Petition was denied without comment.  Id. ¶¶ 45-46.

The Amended Complaint buttresses its contention that the Board's decision is both factually wrong and inappropriately harsh with information developed later that the murder was linked to a patron of Balloons who called from the Club to arrange the murder as a result of jealousy over a mutual love interest.  The Amended Complaint asserts that the subsequent

information confirms that the relationship found by the Board between the murder and the

behavior of management of Balloons is simply wrong.  Id. ¶¶ 51-54.  In the same vein, the

Amended Complaint alleges that Mr. D'Ambra had a "spotless record" until the incident of July

11, 2010.  Id. ¶¶ 41, 60.

In a series of allegations presented by the Amended Complaint as "historical"

background, Id. at 3, the Amended Complaint alleges that, since 1997, there has been a sentiment

within the City of Providence attributable to "certain City officials then and thereafter [who]

continued to oppose the existence of Mr. D'Ambra's business primarily due to the nature of the

business."  Id. ¶ 12.  This opposition first surfaced with the 1997 moratorium policy adopted by

Providence, which banned all adult entertainment for no reason other than the nature of the

dancing and entertainment offered.  Id. ¶ 11.  Mr. D'Ambra himself successfully challenged this

indefinite ban on all licenses; Judge Lagueux found that the moratorium was an executive fiat

forbidding protected speech in the entire municipality and ordered the ban lifted.  D'Ambra, 21

F. Supp. 2d at 108, 114-15.  Next, from 1999 through July 2010, the Amended Complaint

contends that unnamed City officials continued to oppose the existence of Balloons because of

the nature of the business.  Am. Compl. ¶ 12.  A single illustrative example is proffered by the

Amended Complaint: on May 8, 2006, "other City officials" instructed a police lieutenant to

ticket all vehicles parked on Bay Street, a private way from which patrons then entered Balloons

and "other clubs and businesses."  Id. ¶¶ 14-17.  This problem was alleviated because the

Providence Municipal Court rescinded the tickets.  Id. ¶¶ 15-17.  The Amended Complaint

alleges that other less dramatic events occurred that "underscored the continued antipathy of

certain City officials toward Plaintiff's establishment and towards the other clubs in the 'Bay

Street' area."  Id. ¶ 18.

The Amended Complaint is devoid of a factual allegation linking the Board's decision and the antipathy of unnamed City officials.  Indeed, any inference of linkage is somewhat implausible in light of the allegation that the Board singled out Balloons for harsher treatment than other similarly situated adult entertainment clubs.  See id. ¶ 58.  By contrast, the Amended Complaint's antipathy allegations contend that, in 1997, "certain City officials" were opposed to adult entertainment as a class (Id. ¶¶ 11-12), and that, from 1999 to July 2010, "certain City officials" harbored "negativity" not just toward Balloons, but also toward other adult clubs and businesses along Bay Street.  Id. ¶¶ 12, 14, 18.  This opposition was based on the nature of the business.  Id. ¶ 12.

## II.   Amendment of Complaint

Defendants argued that Count II of the Amended Complaint, which is based on substantive due process, should be dismissed because it fails to reference 42 U.S.C. § 1983. Defendants are correct that there is no private right of action grounded directly in the Fourteenth Amendment of the Constitution.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989); Holmes v. Meleady, 738 F. Supp. 2d 196, 201 (D. Mass. 2010); Deamicis v. Mosey, C.A. 02-12432, 2004 WL 57075, at *1 (D. Mass. Jan. 12, 2004).  At oral argument, the Court accepted Plaintiff's offer to move to amend the Amended Complaint to make clear that Count II, like Count IV, is asserted under Section 1983.

Defendants also argued that Plaintiff's Amended Complaint is defective because it fails to identify the "policy" of the City of Providence that is challenged as the basis for municipal liability against the City, its Board of Licenses and the members of the Board in their official capacities.  During oral argument, Plaintiff represented that the challenged "policy" is the decision of the Board of Licenses rendered on August 13, 2010.  To avoid a time-wasting

dismissal with leave to replead to cure this defect, for the purposes of this Motion, the Court also accepted Plaintiff's amendment inserting the allegation that the decision of the Board of August 13, 2010, constitutes the policy of Providence that Plaintiff claims inflicted a constitutional deprivation.  See W. Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329, 333 n.3 (D.R.I. 2012) (in the interest of judicial efficiency, court considered new pleading even though motion to dismiss was based on previous pleading); Holmes, 738 F. Supp. 2d at 201 (in the interest of efficiency, court consolidated all of plaintiff's claims and defendant's arguments even though motion to dismiss technically applied to a superseded complaint); Luthy v. Proulx, 464 F. Supp. 2d 69, 74 (D. Mass. 2006) (since the court would grant leave to amend the complaint, it considered arguments in plaintiff's memorandum that were not in the complaint).

## III.  **Standard of Review**

### A.  **Pleading Standard under Fed. R. Civ. P. 12(b)(6)**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the basic standards applicable in this Circuit under Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), are set out in Air Sunshine, Inc. v. Carl, 663 F.3d 27, 33 (1st Cir. 2011):

> The complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  This is not a probability requirement, but it does require more than a sheer possibility that a defendant acted unlawfully.

Id. (internal citations and quotations omitted).  When the well-pleaded facts in a complaint do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the plaintiff is entitled to relief.  Mayale-Eke v. Merrill Lynch, 754 F. Supp. 2d 372, 376 (D.R.I. 2010).  To survive a motion to dismiss, the plaintiff

must allege well-pleaded facts that cross the line from conceivable to plausible.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 58 (1st Cir. 2012) (quoting Twombly, 550 U.S. at 570).

All well-pleaded facts are to be taken as true and the Court must draw all reasonable inferences from the complaint in the plaintiff's favor.  Marrero-Rodriguez v. Municipality of San Juan, 677 F.3d 497, 500 (1st Cir. 2012); Field v. Napolitano, 663 F.3d 505, 508 (1st Cir. 2011).  Well-pleaded facts, however, do not include the plaintiff's legal conclusions couched as facts or allegations that merely parrot the elements of the cause of action.  Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011); Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

**B.      Municipal Liability**

By asserting claims against the City, the Board and its members in their official capacities, this civil rights case seeks to impose municipal liability on the City of Providence.  Monell, 436 U.S. at 690 n.55 ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").  Such a suit must be treated in all respects other than name as a suit against the municipality.  Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005); Lopera v. Town of Coventry, 652 F. Supp. 2d 203, 211 n.4 (D.R.I. 2009).  Therefore, this Amended Complaint must pass muster under the rubric developed by the courts for when the "person" responsible for a constitutional deprivation is a municipality.  U.S. Const. amend. XIV, § 1.

A municipality may be sued directly for a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988) (quoting Monell, 436 U.S. at 690).

Section 1983 also authorizes suit for constitutional deprivations inflicted pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.  Praprotnik, 485 U.S. at 121.  Monell's insistence that local governments may be held liable only for the results of unconstitutional governmental policy arises from the language and history of Section 1983.  Praprotnik, 485 U.S. at 122.  Cities should be responsible only when their official policies cause their employees to violate another's constitutional rights.  Id.

Based on these principles established in Monell, municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered.  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality op.).  Put differently, municipal liability under Section 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official responsible for establishing the final policy on the subject.  Id. at 483.  Thus, a decision on a single occasion may be enough to establish an unconstitutional municipal policy. Praprotnik, 485 U.S. at 123; Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008); P.L.S. Partners, Women's Med. Ctr. of R.I., Inc. v. City of Cranston, 696 F. Supp. 788, 799 (D.R.I. 1988) ("the single act of a policy-making official may be said to represent an official policy for which the city may be held liable.").  For example, a personnel decision by a school superintendent to take an adverse action against the school nurse may result in municipal liability as long as he is the final policymaker with respect to her employment.  McGreevy v. Stroup, 413 F.3d 359, 368-69 (3d Cir. 2005) (where power was expressly delegated to superintendent, he is deemed to be the "final policy maker" for Section 1983, despite right of plaintiff to appeal to the School Board).  The fact that a higher body within the municipality may have the power of

oversight does not alter who is the final decision maker.  "Final policymakers come in more than

one shape and size."  Young v. City of Providence, 396 F. Supp. 2d 125, 143 (D.R.I. 2005).

Identification of the policymaking officials is a question of state law.  Praprotnik, 485

U.S. at 124.  Authority to make municipal policy may be granted directly by a legislative

enactment or may be delegated by an official who possesses such authority, and whether an

official has final policymaking authority is a question of state law.  Pembaur, 475 U.S. at 483.

An action, even a shocking action, committed by employees of the municipal entity

cannot result in municipal liability without factual allegations establishing that the action was

taken pursuant to an institutional policy or custom.  Marrero-Rodriguez, 677 F.3d at 503

(conscience-shocking behavior by police stated a claim against the officers, but not against

municipality); Soto v. Brooklyn Corr. Facility, 80 F.3d 34, 36 (2nd Cir. 1996) (actions of

correctional employees in knowingly returning inmate to facility where he was likely to be

tortured by fellow inmates gives rise to liability, but does not expose the facility in absence of an

allegation that they were acting pursuant to an institutional policy or custom).  Thus, a complaint

must colorably allege plausible facts to establish a direct causal link between the municipal

policy and the constitutional deprivation.  See Young v. City of Providence, 404 F.3d 4, 25 (1st

Cir. 2005) (plaintiff must show that a municipal policy is the moving force behind the

constitutional deprivation); Ousley v. Town of Lincoln, 313 F. Supp. 2d 78, 84 (D.R.I. 2004).

An illegal custom can expose the municipality if the plaintiff can establish that the

unconstitutional action was so widespread and flagrant that final decision makers may be

deemed to have constructive knowledge of it.  Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st

Cir. 1989) (custom of breaking down doors without a warrant was so long standing, wide-spread

and facially unconstitutional that police chief was deemed to have constructive knowledge of it).

11

While this Circuit has yet to resolve the degree to which a custom case must identify the alleged

decision makers, it is clear that a custom cannot expose the municipality to Section 1983 liability

unless the plaintiff colorably alleges that the unconstitutional custom was so pervasive, well

settled and widespread that the policymaking official of the municipality had actual or

constructive knowledge of it.  Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225, 241 (1st Cir.

2005), abrogated on other grounds by Jennings v. Jones, 587 F.3d 430, 438 n.10 (1st Cir. 2009).

IV.     **Legal Analysis**

     A.     **Plaintiff's Claim Based on the Single Action of the Board of Licenses Does Not Plausibly Allege a Violation of Substantive Due Process or Equal Protection**

Plaintiff contends that the policy of Providence in revoking his licenses constitutes a

single unconstitutional action for which municipal liability may attach.  While Defendants

protest mightily, it is clear that the Board of Licenses was the "final decision maker" for

purposes of its August 13, 2010, decision.  The delegation to the Board of the power to revoke

licenses based on public safety is directly from the General Assembly.  R.I. Gen. Laws § 5-22-5.

The Charter also delegates the power to revoke licenses based on reasons as the "board may

deem to be in the public interest."  Providence, R.I., Charter § 1102(b)(3).  The mere fact that the

Charter also makes the Board subject to terms, limitations and conditions prescribed by

ordinances of the City Council does not alter the delegation by both Rhode Island statute and the

Charter of the discretionary power to revoke licenses for reasons of public safety.  Young, 396 F.

Supp. 2d at 144-45 (where Charter makes chief of police a policy maker, with approval of

mayor, on subject of police training, chief has final decision-making authority sufficient to

expose the City to Section 1983 liability).  It is true that the City Council has enacted zoning

ordinances that affect the locations where licensed establishments may be situated and the hours

when licensed entities may be open.  Providence, R.I., Ordinances, ch. 14, art. I, § 14.1(b); ch. 27, art. III, § 303.  However, the Board's decision of August 13, 2010, did not address either location or time of operation.  Rather, it examined evidence from the incident to determine whether the management of Balloons was operating in a manner so as to jeopardize public safety; its decision is entirely focused on public safety.  Am. Compl., Ex. 1.  State law is clear: R.I. Gen. Laws § 5-22-5 and Section 1102(b)(3) of the Charter make the Board the final decision maker in Providence regarding the revocation of Plaintiff's licenses on August 13, 2010, based on public safety.

Defendants also argue vigorously that a single decision of the Board cannot give rise to municipal liability.  They are wrong.  The Supreme Court has determined that single acts by officials with final authority could constitute official policy for purposes of municipal liability.  Pembaur, 475 U.S. at 483, 485.  A plurality of the Court in Pembaur held that a single decision to follow a course of action, when made by the official with final authority to establish policy in that aspect of the municipality's business, could subject a municipality to liability under Section 1983.  Id.  Thus, the single decision of the Town Administrator to deny the plaintiff the right to play in a golf tournament on the town-owned course based on her gender was enough to expose the municipality.  Joyce v. Town of Dennis, 705 F. Supp. 2d 74, 80-81 (D. Mass. 2010).  Similarly, the single decision by the Board of License of Springfield to suspend a liquor license based on the applicant's race was sufficient for municipal liability.  Quarterman v. City Springfield, 716 F. Supp. 2d 67, 76-77 (D. Mass. 2009).

Because the action of the Board could give rise to municipal liability, this Court turns next to an examination of the Amended Complaint to determine whether Plaintiff has asserted

facts sufficient to plausibly assert a constitutional defect arising from the August 13, 2010, decision.

As a threshold matter, Providence, through its Board of Licenses, may legitimately regulate the secondary effects of nude dancing (such as increased crime) through reasonable time, place and manner restrictions that do not forbid protected speech.[3] City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 49-50 (1986); Saints & Sinners v. City of Providence, 172 F. Supp. 2d 348, 351-52 (D.R.I. 2001). Regulation of secondary effects of adult entertainment businesses is not a regulation of content and a classification of such businesses for regulation of secondary effects does not impinge on a fundamental right, nor does it involve a suspect classification. Isbell v. City of San Diego, 258 F.3d 1108, 1116 (9th Cir. 2001); see also Vono v. Lewis, 594 F. Supp. 2d 189, 196 (D.R.I. 2009). Thus, a statute that permits the revocation of a license based on public safety is permissible regulation and the Board's action in carrying out that policy inflicts no constitutional harm.

Also of no constitutional import is the claim, vigorously alleged by Plaintiff, that the Board's decision got the facts seriously wrong. The First Circuit "has made it abundantly clear that a federal court should not sit as a super zoning board of appeals." Trafford v. Penno, 800 F. Supp. 1052, 1057 (D.R.I. 1992) (citing Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 829, 833 (1st Cir. 1982) (no substantive due process violation even if the town engaged in adversarial or arbitrary tactics)). Regulatory boards do not transgress substantive due process merely by making decisions for erroneous reasons. Pawtucket Transfer Operations, LLC v. City of Pawtucket, 539 F. Supp. 2d 513, 520 (D.R.I. 2008). Likewise, departures from administrative procedures or permit denials based on illegitimate reasons ordinarily do not amount to violations

---

[3] Because the Board's decision is focused only on Balloons and the risk to public safety arising from its operations, the allegations based on the 2010 action of the Board differ markedly from the First Amendment violation arising from the ban on all adult entertainment found in 1997 in D'Ambra, 21 F. Supp. 2d at 111-14.

of equal protection.  PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991), abrogated on other grounds by San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 490 n.20 (1st Cir. 2012); Trafford, 800 F. Supp. at 1057.  Otherwise, disgruntled permit applicants could create constitutional claims simply by alleging they were treated differently from similarly-situated applicants.  Trafford, 800 F. Supp. at 1057; accord Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007) ("virtually every zoning decision–in the absence of a sensible limiting principle–would be a candidate to find its way to federal court in the guise of an equal protection claim").

The remaining issue is whether the antipathy allegations that lurk in the background of this Amended Complaint can plausibly be inferred to have tainted the Board's decision, making it other than what it appears to be.

In Praprotnik, 485 U.S. at 128, the Supreme Court faced a similar conundrum.  The result is clear – that dog won't hunt.  In Praprotnik, the plaintiff alleged a scheme of retaliation resulting in various hostile actions by various municipal supervisors.  Id. at 115-18.  However, it was not those actions, but the decision to fire him that was the crux of the plaintiff's claim.  Id. at 128.  That decision was made by an independent Civil Service Commission, which was tasked by the City Charter with making personnel decisions on the basis of merit and fitness.  Id. at 128-29.  In the absence of affirmative evidence linking the Commission's decision to the retaliation, thereby establishing that the municipality's actual policies were different from the ones that were laid out in the Charter, the Supreme Court held that there cannot be municipal liability.  Id. at 130; see also Quinn v. Monroe Cnty., 330 F.3d 1320, 1326 (11th Cir. 2003) (where supervisor's decision to terminate employment reviewed by Career Service Council, which made detailed

factual findings, and plaintiff produced no evidence that improper motive of supervisor was approved by Council, no County liability).

Analogous to the Commission in <u>Praprotnik</u> and the Council in <u>Quinn</u>, Providence's Board had the discretionary power to revoke licenses on grounds of public safety.  All of the factual allegations in the Amended Complaint suggest that is precisely what it did – it held an extensive evidentiary hearing with testimony about public safety issues and rendered a decision consisting of public safety findings.  There are no affirmative factual allegations to the contrary; moreover, an inference of linkage is implausible because the antipathy of "other City officials" was allegedly focused on adult entertainment either generally or in the vicinity of Bay Street, while the Board's adverse action allegedly was targeted on Plaintiff as a class of one.  The class of the similarly-situated entities that the Amended Complaint alleges were treated favorably is populated by other adult entertainment clubs.  In the absence of a plausible factual allegation that the Board deviated from its obligation to revoke licenses based on public safety and instead was guided by some other policy established by a decision maker, municipal liability cannot attach for the "antipathy" alleged in the Amended Complaint.[4]  <u>Praprotnik</u>, 485 U.S. at 128.  Without

---

[4] The absence of an affirmative link to the decision of the Board nullifies the allegations of "antipathy."  It is well settled that allegations of a government effort to "get" a plaintiff, unhinged from policy set by a municipal decision maker, do not state a claim under Section 1983.  Thus, in an oral decision that is referenced in two reported cases, this Court considered the claim that the Providence police were out to "get" an adult entertainment club by stationing officers outside the club in what the plaintiff claimed was an illegal policy directed against adult entertainment.  <u>Sean Patrick, Inc. v. City of Providence</u>, C.A. No. 96-689L (D.R.I. Apr. 24, 1998).  Judge Lagueux held that the claim should be dismissed because there was no "policy" promulgated by the highest authority in the city.  See <u>Young</u>, 396 F. Supp. 2d at 144 (discussing facts and holding of <u>Sean Patrick, Inc.</u>); <u>Hartford Park Tenants Ass'n v. R.I. Dep't of Envtl. Mgmt.</u>, C.A. 99-3748, 2005 WL 2436227, at *38 (R. I. Super. Ct. Oct. 3, 2005) (same).  Numerous cases have rejected constitutional claims against a municipality based on hostility by public officials.  See, e.g., <u>Bordanaro</u>, 871 F.2d at 1155 (city is exempt from municipal responsibility for aberrant and unpredictable behavior of employees); <u>Foley v. Town of Lee</u>, 871 F. Supp. 2d 39, 52-53 (D.N.H. 2012) (allegation that town officials were out to get plaintiff by forcing them to leave their camper and campground does not state a claim under Section 1983); <u>Baxter v. Conte</u>, 190 F. Supp. 2d 123, 128-30 (D. Mass. 2001) (allegation that officials of Worcester in a vendetta against plaintiff fails to state a claim under Section 1983); <u>Coleman v. Town of Lee</u>, No. 12-cv-109, 2012 WL 4725502, at *4 (D.N.H. Sept. 10, 2012) (allegation that town officials engaged in unreasonable bluelighting of plaintiff fails to state a claim under Section 1983).

such an allegation, under <u>Praprotnik</u>, Plaintiff has failed to nudge its claims "across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570. Counts II and IV fail to state a claim.

In a stretch to save Counts II and IV, one might speculate that they could be read to allege an illegal custom of which the Board's decision is a single manifestation. However, an illegal custom can expose the municipality only if the plaintiff can establish that a specific unconstitutional activity was so widespread, flagrant and plainly unconstitutional that final decision makers may be deemed to have constructive knowledge of it. <u>Bordanaro</u>, 871 F.2d at 1157 (evidence that custom of breaking down doors without a warrant was so long standing, wide-spread and facially unconstitutional that police chief was deemed to have constructive knowledge). This Amended Complaint does not move the meter. <u>Cf.</u> <u>Twombly</u>, 550 U.S. at 556-57 (non-specific allegations of conspiracy and parallel conduct are not sufficient to state a claim).

This Court need not go further. Nevertheless, it is worth examining Plaintiff's specific constitutional contentions. In their Motion, Defendants contend that neither Plaintiff's claim of a deprivation of substantive due process nor his claim of a deprivation of equal protection hold water in the face of <u>Iqbal</u>'s requirement of plausible factual allegations. They are right. Counts II and IV not only fail to plausibly allege facts sufficient to expose Providence to municipal liability, but also substantively fail to state a plausible claim of a constitutional deprivation.

### 1.    Substantive Due Process

Count II claims that the Board deprived Plaintiff of his right to substantive due process. The Fourteenth Amendment's guaranty of substantive due process supports a theory of recovery that turns on whether the alleged misconduct "shocks the conscience." <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 272 (1st Cir. 2009); <u>Espinoza v. Sabol</u>, 558 F.3d 83, 87 (1st Cir. 2009). Put

differently, the action of an executive of a municipality violates the substantive component of the Due Process Clause "when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998).  The shooting of a police trainee in the back during a training exercise is an example of conduct that shocks the conscience.  Marrero-Rodriguez, 677 F.3d at 501-02.  A substantive due process claim also requires proof that the conscience-shocking actions of the defendant deprived the plaintiff of a protected interest in life, liberty or property.  See, e.g., Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011); Estate of Bennett v. Wainwright, 548 F.3d 155, 162 (1st Cir. 2008).  The Supreme Court has been firm in its reluctance to expand the scope of substantive due process.  Maldonado, 568 F.3d at 273 (citing Chavez v. Martinez, 538 U.S. 760, 775 (2003)).

To be conscience-shocking, a defendant's actions "must be truly outrageous, uncivilized, and intolerable . . . and the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."  Harron, 660 F.3d at 536 (quotation marks and citations omitted). An action that shocks the conscience manifests an extreme lack of proportionality, violations of personal rights so severe and so inspired by malice or sadism as to be a brutal and inhumane abuse of official power.  Gonzalez-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010); compare Soto, 80 F.3d at 36 (returning inmate to facility where guards knew he would be tortured creates liability), with Foley v. Town of Lee, 871 F. Supp. 2d 39, 51-53 (D.N.H. 2012) (threatening plaintiffs with arrest and forcing them to leave their camper and campground are not conscience shocking).  If there is any arguable governmental interest justifying the challenged action, a substantive due process violation is very unlikely.  See Maldonado, 568 F.3d at 273 (citing Chavez, 538 U.S. at 775); see also Collins v. Nuzzo, 244 F.3d 246, 250 (1st Cir. 2001)

(plaintiff must demonstrate the government action "is not sufficiently keyed to any legitimate state interests.").

In Pagan v. Calderon, 448 F.3d 16 (1st Cir. 2006), the First Circuit focused on how to analyze a claim of substantive due process arising, like Plaintiff's claim here, from the discretionary licensing determination of local decision makers. In a strongly-worded holding, the court stated:

> We have held, with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decision makers, whether those decisions are right or wrong. While we have "left the door slightly ajar for . . . truly horrendous situations," any permit or license denial, no matter how unattractive, that falls short of being "truly horrendous" is unlikely to qualify as conscience-shocking.

Id. at 33 (internal citations omitted).

In support of the allegation of a violation of substantive due process, Count II contends that the Board's decision amounts to conduct that shocks the contemporary conscience in that the actions of the Board were arbitrary, capricious and irrational,[5] flouted the law and trammeled on Plaintiff's property rights in the licenses.[6] Am. Compl. ¶¶ 61-64. It claims the Board interfered with otherwise constitutionally-protected activity, but concedes that Plaintiff "has not at this time discovered any particular constitutional provision or amendment that provides an explicit textural [sic] source of constitutional protection against the particular type(s) or sort of government behavior described herein." Id. ¶ 65. Count II also concedes that the Board's

---

[5] The paragraph of the Amended Complaint that contends the Board was arbitrary, capricious and irrational also mentions that the Board has refused to adopt rules and regulations, "despite requests by various citizens and/or civic organizations." Am. Compl. ¶ 62. Because the Amended Complaint otherwise is devoid of any allegations about lack of procedural due process, this aside is not considered further.

[6] Count II asserts that Plaintiff's licenses to operate Balloons constituted a protectable property right. Id. ¶ 61. Plaintiff is correct that the entitlement to the licenses can amount to a protectable property right; for example, if he can demonstrate that the Board was bound to deny the petition of the police and decline to revoke his licenses, then he had a protectable property interest in them. See D'Ambra, 21 F. Supp. 2d at 109.

decision was based on its duty to protect public safety; however, it contends that the decision of August 13, 2010, was far more draconian and punitive than the consequences imposed on other clubs where public safety was at issue.  Id. ¶ 57.

These factual allegations cannot overcome that the Board was acting within its discretion to protect a highly-justifiable governmental interest – public safety.  Further, they do not plausibly approach the conscience-shocking level sufficient to set forth a claim of deprivation of substantive due process.  See Collins, 244 F.3d at 251 (plaintiff alleged racial animus, but license denial fell short of shocking the conscience because licensing board's action was legally rational based on plaintiff's previous violations of the license); Marek v. Rhode Island, No. 11-033, 2012 WL 693566, *4-5 (D.R.I. Mar. 2, 2012) (slip op.) (permit denial based on allegedly improper extensions and fraudulent maps is not truly horrendous conduct sufficient to violate substantive due process); Pawtucket Transfer Operations, LLC, 539 F. Supp. 2d at 523-24 (plaintiff fails to make constitutional mountain out of a planning dispute molehill); Quarterman, 716 F. Supp. 2d at 74 (adverse decision on liquor license does not shock the conscience although it allegedly was made based on racial animus); Ciampi v. Zuczek, 598 F. Supp. 2d 257, 264 (D.R.I. 2009) (impassioned rhetoric cannot convert commonplace behavior into conscience-shocking violation).  Count II cannot clear the Iqbal/Twombly bar.

### 2.    Equal Protection

The Fourteenth Amendment's Equal Protection Clause is the other hook on which Plaintiff hangs his hat.  Generously read, Count IV claims that the Board's decision to revoke his license singled him out for adverse treatment because other similarly-situated clubs, whose operations Plaintiff claims have also been linked to incidents of violence, received less draconian consequences.  Am. Compl. ¶¶ 58, 76.  In fleshing out his equal protection argument, Plaintiff argues, but does not mention in his Amended Complaint, that he was singled out in a "class of

one" for intentionally-different treatment and there was no rational basis for the difference.  ECF No. 19-1, at 6.  The Amended Complaint's conclusory allegations include the assertion that the Board's decision violated Plaintiff's equal protection rights because the Board acted with animus, maliciousness and corruption, in gross abuse of power.  Am. Compl. ¶ 76.

To state a claim under the Equal Protection Clause, Plaintiff must plausibly state facts alleging: (1) that he was intentionally treated differently (2) from others similarly situated (3) without a rational basis for that difference in treatment.  Vill. of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000); see also SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008) ("[T]o establish its claim, … [a plaintiff must] allege facts indicating that, 'compared with others *similarly situated*, [it] was selectively treated … based on impermissible considerations such as … malicious or *bad faith* intent to injure a person.'") (second omission in original) (emphasis in original) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995)). For purposes of a threshold review of the pleading under Iqbal/Twombly, Plaintiff's Amended Complaint squeaks by the first and second prongs of the equal protection test in that it alleges that the Board heard evidence about the Balloons incident that was superficially similar to what it had heard about other specifically-named clubs, yet intentionally imposed a materially harsher sanction.[7]  The Amended Complaint plainly flounders, however, on the prong that requires plausible allegations of the absence of any rational basis for the difference in treatment or impermissible considerations as malicious or bad faith intent.

---

[7] The Amended Complaint alleges that the Balloons 2010 incident involved a melee and murder that the Board linked to the operations of the Club and that at least three other clubs were linked to murders during the period 2002 to 2009, yet their licenses were not totally revoked.  The Amended Complaint is silent regarding the findings of the Board with respect to the behavior of the management of the other clubs in properly attending to public safety. Thus, a plausible factual inference is that the Board's determination regarding the responsibility of club management for each incident was different.  Whether this level of inquiry is appropriate at the Rule 12(b)(6) phase is a close call even after Iqbal.  SBT Holdings, LLC, 547 F.3d at 35.  Since Count IV clearly fails due to the absence of a plausible allegation that the Board's distinctions between various clubs lack any rational basis, it is not necessary to pursue this analysis.

An equal protection claim will only succeed if the decision to treat an individual differently from those similarly situated is wholly "arbitrary or irrational." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 104 (1st Cir. 2002) ("class of one" equal protection claim is "an exceptionally deferential one"). When a decision maker has discretionary authority to award or withhold a benefit, a plaintiff who grounds an equal protection claim on the denial of that benefit faces a particularly steep uphill climb. Pagan, 448 F.3d at 34; Priolo v. Town of Kingston, 839 F. Supp. 2d 454, 461 (D. Mass. 2012) (decision by town officials not to repair plaintiff's driveway, which was different from those town did repair, has some rational basis; no violation of equal protection). The question does not require an inquiry into the decision maker's state of mind at the time the contested decision was made; rather, the relevant question is "whether anyone, including the judge, can conceive of a rational reason for such a classification." Priolo, 839 F. Supp. 2d at 462 (quoting Jeneski v. City of Worcester, 476 F.3d 14, 17 (1st Cir. 2007)).

The absence of rational basis means that there is not the slightest trace of a legitimate governmental purpose. Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143-46 (D. Mass. 2006) (citing Rubinovitz, 60 F.3d at 912 (city official who engaged in malicious orchestrated campaign against plaintiff for no purpose potentially violated equal protection)). In the absence of concrete factual allegations that the challenged decision was utterly devoid of any legitimate governmental purpose, the complaint fails to state a claim based on the Equal Protection Clause. See Lopera, 652 F. Supp. 2d at 217-18 (speculative allegations that search of Central Falls soccer players was racially motivated insufficient to state an equal protection claim where search had a rational basis because team was under suspicion for theft); Walsh, 431 F. Supp. 2d at 145

(allegations of differential treatment based on gender and Native American heritage not enough where city officials offer rational reasons for the difference).

Plaintiff's equal protection claim stumbles on the Board's decision, which is facially grounded in the need to protect public safety and thus is based on a legitimate governmental interest.  The pleading's conclusory allegations state that the Board's disparate treatment was the result of "animus, maliciousness, and/or corruption;" however, the factual allegations plausibly permit the inference that the differential treatment here arose as a result of the determination of the Board, a discretionary decision maker, that the disturbing evidence (for example, that the manager went to his car to get a machete and a baseball bat) regarding the irresponsible behavior of Balloons's management justified the harsher sanction.  Plaintiff's allegation (Am. Compl. ¶ 39) that the Board could have drawn other inferences from this evidence confirms that the Board's decision had some rational basis.  See SBT Holdings, LLC, 547 F.3d at 34 (no equal protection claim when the complaint discloses "facts that would have served as a rational basis for the difference in treatment").  Plaintiff does not allege even in a conclusory fashion that the Board's decision was utterly devoid of any legitimate governmental purpose – rather, he claims that the Board got the facts wrong and imposed an unduly harsh sanction as a result.  In this Circuit, dismissal on a Fed. R. Civ. P. 12(b)(6) motion is appropriate when the pleading has such a deficit.  See Pagan, 448 F.3d at 35 (where statute required decision maker to speculate about imprecise factors, plaintiff falls short of carrying its modest burden under Rule 12(b)(6)).

Plaintiff also fails adequately to plead that the difference in treatment was due to malicious or bad faith intent on the part of Defendants to injure him.  It is not clear that this deficit is independently fatal because it is not clear whether maliciousness or bad faith intent is an essential element of an equal protection class of one claim.  See Cordi-Allen, 494 F.3d at 250

n.3 (court declines to clarify whether malice or bad faith intent to injure is an element of an equal protection claim). Rather, the existence of malicious motivation has a bearing on whether there is a legitimate rational basis; therefore, its absence here must be noted. SBT Holdings, LLC, 547 F.3d at 34; Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004) (citing Vill. of Willowbrook, 528 U.S. at 566 (Breyer, J., concurring)); see Pagan, 448 F.3d at 34 (plaintiff must allege plausible facts that demonstrate that the different treatment resulted from a gross abuse of power, invidious discrimination or some other fundamental procedural unfairness). In connection with the rational basis inquiry, the cases have held that an equal protection claim requires plausible factual allegations that the plaintiff was selectively treated differently from others similarly situated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure a person. Tapalian, 377 F.3d at 5; Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001); Pawtucket Transfer Operations, LLC, 539 F. Supp. 2d at 522-23.

Plaintiff's equal protection claim points to the animosity of unnamed City officials, as demonstrated by such police activity as the issuing of parking tickets on May 8, 2006, to establish the requisite maliciousness or bad faith. ECF No. 19-1, at 7-8. However, the Amended Complaint fails to link this animosity to the Board's decision except through speculation that the testifying officers were motivated by it so that the Board's findings were based on perjury resulting from this animus. Based on the pleading, it is sheer speculation to suppose that the Board itself abandoned its duty to make the decision based on safety and instead was swayed by the animus alleged in the Amended Complaint. Lopera, 652 F. Supp. 2d at 217-18 (speculative allegations that search of Central Falls soccer players was racially motivated insufficient to state an equal protection claim); cf. Sullivan v. City of Springfield, 561 F.3d 7, 15 (1st Cir. 2009)

24

(speculation that a city did not hire based on race is insufficient to prove an equal protection claim).

The pleading in Count IV does not implicate invidious discrimination based on suspect or quasi-suspect classifications (such as race or gender). Any whiff of a First Amendment basis for the action is snuffed out by the allegation that the similarly-situated clubs who received favorable treatment were also in the adult entertainment business. Further, Plaintiff does not base his claim on any procedural irregularities: there is "nothing in the facts alleged to indicate the sort of fundamentally unfair procedural rigmarole that might support an equal protection claim." Pagan, 448 F.3d at 36. Finally, "gross abuse of power" in the equal protection setting must equate to conduct that "shocks the conscience" as that concept is used in due process cases. Id.; Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000). Plaintiff's treatment by the Board simply does not come close.

Count IV fails because the plausible factual allegations in Plaintiff's Amended Complaint assert that the Board made a discretionary decision based on public safety as mandated by state law, and rendered a decision with findings directly related to safety considerations. "Drawing distinctions is what . . . regulators do every day"; otherwise, "every routine governmental decision at the state and local level-of which there are millions every year-could become a class-of-one case in federal court." Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8, 16 (1st Cir. 2010). The Court could speculate that the alleged actions of the police in petitioning to shut down Balloons and in testifying falsely at the hearing were based on animosity towards Mr. D'Ambra, so that the Board's incorrect findings and harsh penalty by comparison with other clubs were affected by that animosity. Even with such speculation, it remains that the Board's decision is focused on public safety and simply is not the stuff of

25

"utterly unjustified, malignant, and extreme actions of those who would be parochial potentates."
Walsh, 431 F. Supp. 2d at 145.

Plaintiff's equal protection claim fails to state a claim under Iqbal and Twombly.

### B.      Remand of State Law Claims

The remaining claims (Counts I and III) present unusually complex issues with regards to whether they are genuinely purely state claims, giving this Court discretion to decide whether they should be retained or remanded to state court.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 348-57 (1988); Penobscot Indian Nation v. Key Bank of Me., 112 F.3d 538, 564 (1st Cir. 1997).  Defendants do not seek dismissal of the state law claims that come within this Court's supplemental jurisdiction.  Rather, they urge this Court to exercise its discretion to retain supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

Count I actually seems to have vestiges of federal claims in that, for example, it seeks a declaration under 28 U.S.C. § 2202 that the decision of the Board violates substantive due process and constitutes a grossly-excessive penalty.  While Count III appears to arise purely under state law in claiming that the Board intentionally interfered with Plaintiff's relationships with his customers, there is a whiff of federal law to the extent that one of the elements of the state law claim – absence of legal justification for the interference – takes this Court back into the question whether the Board acted in a way that violated Plaintiff's constitutional rights.  UST Corp. v. Gen. Rd. Trucking Corp., 783 A.2d 931, 937 (R.I. 2001).  I further note that these two Counts also appear to be a collateral attack on the decision of the Rhode Island Supreme Court, which declined to issue the writ of certiorari with respect to Plaintiff's challenge to both the factual findings and the penalty of the Board.  Am. Compl. ¶¶ 45-46.  To that extent, the doctrine of *res judicata* may deliver a fatal blow.  If not, this Court needs to be mindful of the Rooker-

Feldman doctrine, which seeks to prevent disappointed state court litigants from "appealing" their cases into the federal system. See generally Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005); Jack Beermann, Comment on *Rooker-Feldman* or Let State Law Be Our Guide, 74 Notre Dame L. Rev. 1209, 1212 (1999).

Under such circumstances, this Court's determination whether to retain supplemental jurisdiction despite the early stage of the case is a close call. On balance, because of the federal overtones in Counts I and III, I recommend that the Court retain jurisdiction. Cf. Marek, 2012 WL 693566, at *6 (court exercises discretion to dismiss state law claims because central issue of case was a matter of state law).

## V.   Conclusion

Here, Plaintiff's attack on the Board can be boiled down to the allegation that it got the facts completely wrong – the police exaggerated, the lawyers fulminated and the Board was bamboozled, resulting in an erroneous decision that Plaintiff is barred from operating an adult entertainment club based on misguided worries about public safety. The parallel claims of vague hostility and animosity do not trigger municipal liability under Section 1983. While the Board's decision could expose Providence to municipal liability, nothing in the Amended Complaint colorably alleges a constitutional deprivation. Rather, the Board appears to have engaged in appropriate regulation of secondary effects of adult entertainment and the plausible factual allegations do not approach the threshold necessary to state a claim under Section 1983 of a deprivation either of substantive due process or of equal protection. Pawtucket Transfer Operations, LLC, 539 F. Supp. 2d at 520-24. Accordingly, I recommend that Defendants' Motion to Dismiss be GRANTED and that Counts II and IV be dismissed. Finally, because there

appear to be threads of federal law woven into the remaining claims, I recommend that the Court retain jurisdiction of Counts I and III for further proceedings.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 26, 2012